IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **AMIR M. MESHAL,**<br>             *Plaintiff,*<br>     v.<br><br>CHRISTOPHER C. WRIGHT, in his official capacity as Commissioner of the Georgia Department of Public Safety; JOSHUA J. JANUFKA; KEITH OGLESBY; DERRICK FRINK,<br><br>             *Defendants.* | Civil Action No. _____ |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1.      This case seeks to vindicate the Fourth Amendment rights of Mr. Amir M. Meshal, a U.S. citizen whom Georgia police subjected to an extended and invasive search and seizure following a routine traffic stop because he is on a federal watchlist. Mr. Meshal has been on the watchlist since at least 2009. He has petitioned multiple times for his removal from the watchlist, or for a fair process by which to contest his continued placement on the watchlist, but the federal government has rejected those requests. Mr. Meshal's mere inclusion on the watchlist cannot give rise to reasonable suspicion or probable cause to believe that he is presently violating domestic criminal law. Nevertheless, Georgia law enforcement officers used his inclusion on the watchlist as justification for a prolonged and unjustified detention, during which they handcuffed him, placed him in the back of a caged squad car, and performed a warrantless, nonconsensual search of his vehicle over the course of an hour and a half. The encounter ended with Mr. Meshal receiving a courtesy warning for following another vehicle too closely.

1

2. This is not the first time that domestic law enforcement officers have wrongly used Mr. Meshal's inclusion on the watchlist to extend the scope and duration of a routine traffic stop, and it is not likely to be the last. Such detentions and searches on the basis of Mr. Meshal's status on the watchlist violate his Fourth Amendment rights against unlawful seizures, for which he seeks monetary and equitable relief pursuant to 42 § U.S.C. 1983. In doing so, Mr. Meshal seeks to establish that his inclusion on the watchlist is not a scarlet letter that supplies open-ended justification for extended and invasive encounters with domestic law enforcement officers as a matter of course—potentially for the rest of his life.

## JURISDICTION AND VENUE

3. This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

4. Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in Bryan County, Georgia, which is situated within the district and divisional boundaries of the Savannah Division of the Southern District of Georgia.

## PARTIES

5. Plaintiff Amir M. Meshal is 39 years old and is an independent contractor who delivers loads in his semi-truck. He was born and raised in Long Branch, New Jersey, and is a U.S. citizen. Mr. Meshal currently resides in St. Paul, Minnesota.

6. Defendant Officer Joshua J. Janufka is and was at all times relevant to the Complaint a Georgia State Patrol Officer (Badge Number 0905) and an employee of the Georgia Department of Public Safety. He is sued in his individual and official capacities. At all times relevant to the Complaint, Defendant Janufka acted under the color of law.

7. Defendant Officer Keith Oglesby was at all times relevant to the Complaint a Georgia State Patrol Officer (Badge Number 0539) and an employee of the Georgia Department of Public Safety. Defendant Oglesby responded to a January 23, 2020 traffic stop of Mr. Meshal in Richmond Hill, Georgia. He is sued in his individual and official capacities. At all times relevant to the Complaint, Defendant Oglesby acted under the color of law.

8. Defendant Colonel Christopher Wright is sued in his official capacity for prospective relief only as Commissioner of the Georgia Department of Public Safety ("GDPS"). As Commissioner of GDPS, Defendant Wright is required by statute to "supervise, direct, account for, organize, plan, administer, and execute the functions vested in the department by law." O.C.G.A. § 35-2-3. The Georgia State Patrol ("GSP") is a division of the GDPS. O.C.G.A. § 35-2-30. Defendant Wright is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

9. Defendant Deputy Derrick Frink is and was at all times relevant to the Complaint a K-9 handler with the Chatham County Sheriff's Office Regional K-9 Resource Team. Defendant Frink responded to a January 23, 2020 traffic stop of Mr. Meshal in Richmond Hill, Georgia. He is sued in his individual capacity. At all times relevant to the Complaint, Defendant Frink acted under the color of law.

## FACTS

### *January 23, 2021 Stop and Detention*

10. Mr. Meshal works as an independent carrier for hire, contracting with companies to deliver goods with his semi-truck. Mr. Meshal regularly drives on interstate highways in and through Georgia while making deliveries.

11. On the afternoon of January 23, 2020, Mr. Meshal was driving north on Interstate 95 through Bryan County, Georgia in his semi-truck with no trailer attached. Mr. Meshal was returning home after delivering equipment for the halftime show of Super Bowl LIV at Hard Rock Stadium in Miami Gardens, Florida.

12. At approximately 3:00 p.m. on January 23, 2020, Defendant Officer Joshua J. Janufka pulled Mr. Meshal over in Richmond Hill, Georgia.

13. Officer Janufka approached the semi-truck and requested Mr. Meshal's license and registration. Mr. Meshal provided these documents. Officer Janufka then explained that he had pulled Mr. Meshal over for following too closely to the vehicle in front of him.

14. Officer Janufka told Mr. Meshal that he would issue him a courtesy warning but not a ticket. Officer Janufka suggested that, because it was raining, they return to Officer Janufka's GSP squad car to talk. Mr. Meshal exited his semi-truck and entered Officer Janufka's squad car on the front passenger side.

15. Once inside the squad car, Mr. Meshal noticed that a camera was mounted on the windshield. It was pointed at Mr. Meshal's semi-truck at first, but Officer Janufka turned it to point at Mr. Meshal when he entered the squad car.

16. Approximately four minutes after Mr. Meshal entered the squad car, Defendant Officer Keith Oglesby pulled his vehicle up behind Officer Janufka's squad car.

17. Officer Janufka asked a series of questions that Mr. Meshal understood to be standard questions that truck drivers are asked during traffic stops to ensure that they are following regulations. Mr. Meshal told Officer Janufka that he had picked up his load in Delaware and had dropped it off in Miami. He showed Officer Janufka the bill of lading containing information about the load. Mr. Meshal told Officer Janufka that, after he dropped off

4

the load, he visited his mother in Belleair Beach, about five hours away from Miami. He stayed there for two nights and was on his way to New Jersey when he was pulled over.

18. Officer Janufka asked Mr. Meshal whether he had been arrested before. Mr. Meshal told Officer Janufka that he had been arrested a long time ago and could not remember what for, but that it was probably for driving with a suspended license.

19. Officer Janufka then asked Mr. Meshal if he would consent to a search of his semi-truck.

20. Mr. Meshal declined to consent to a search of his vehicle. Mr. Meshal told Officer Janufka that there was no probable cause to search his vehicle and asked Officer Janufka why he wanted to search it. Officer Janufka did not explain why he wanted to search the truck, but he reiterated his request for Mr. Meshal's consent, which Mr. Meshal again refused to give.

21. Officer Janufka then called for a K-9 unit.

22. Officer Janufka returned to the squad car where Mr. Meshal was sitting in the front of the squad car and asked Mr. Meshal to exit the vehicle. Officer Janufka explained to Mr. Meshal that "[s]omething was wrong" with Mr. Meshal and that he did not know what it was, but that he had to detain Mr. Meshal as a result.

23. Officer Janufka instructed Mr. Meshal to put his hands on the roof of the squad car and then conducted a pat-down search of Mr. Meshal. Officer Janufka removed Mr. Meshal's cell phone from his pocket. During the pat-down search, Officer Oglesby came over and asked Mr. Meshal for his social security number and date of birth. Mr. Meshal provided this information to the second officer, who wrote it down and returned to his squad car.

24. After completing the pat-down search, Officer Janufka pulled one of Mr. Meshal's arms behind his back. When Mr. Meshal asked him what he was doing, Officer Janufka

responded, "you're not under arrest but I have to detain you." Mr. Meshal lowered his other arm behind his back, and Officer Janufka handcuffed him. Officer Janufka told him that because Mr. Meshal has wide shoulders, he would have to double cuff Mr. Meshal by linking two handcuffs to each other to create a longer chain.

25. After handcuffing Mr. Meshal, Officer Janufka opened the back door of the squad car and placed Mr. Meshal inside.

26. As Officer Janufka was placing Mr. Meshal in the squad car, Mr. Meshal told him that he had to go to the bathroom. Officer Janufka said that Mr. Meshal should have told him this before he put the handcuffs on, and Mr. Meshal responded that he did not know that he was going to be handcuffed. Officer Janufka told him to "just hang tight" and closed the door.

27. At this point, Mr. Meshal had been detained for approximately thirty minutes from the time of the initial stop.

28. Once he was returned to the squad car, Mr. Meshal had a view of the squad car's computer terminal from where he was sitting in the back seat. He could see writing on the screen and one word jumped out: "Terrorist."

29. Officer Janufka reentered the squad car and sat in the driver's seat. He told Mr. Meshal that narcotics- and explosives-detecting canine teams were on their way. Mr. Meshal asked Officer Janufka if he was being detained because he is on a watchlist. Officer Janufka responded, "Exactly. So, you know what's going on?" Mr. Meshal explained that he's been on the federal No Fly List since at least 2009. Mr. Meshal explained that he had been detained in 2007 in Somalia by Kenyan authorities working with federal law enforcement agencies, and that he ended up on the No Fly List after refusing the FBI's requests to work as an informant. Officer Janufka told Mr. Meshal, "This is over my head. I'm getting instructions on what to do."

30. Officer Janufka continued to ask Mr. Meshal more questions. He asked whether Mr. Meshal had explosives, narcotics, marijuana, weapons, cocaine, large amounts of cash, or anything else that law enforcement should be concerned about in his truck. Mr. Meshal answered "no" to all these questions.

31. Officer Janufka also told Mr. Meshal that he was "waiting on a phone call from the FBI" for guidance about whether Officer Janufka should arrest him. Officer Janufka repeated this remark several times during Mr. Meshal's detention.

32. Approximately thirty minutes after Mr. Meshal had been handcuffed and placed in the back of the squad car, and approximately one hour after initially being pulled over, two additional officers arrived in separate vehicles. Defendant Deputy Derrick Frink arrived wearing a dark green uniform with the word "SHERIFF" emblazoned across the front. The other officer was a white female in a faded olive-green uniform. Officer Janufka explained to Mr. Meshal that Deputy Frink had a dog trained to detect explosives, and that the female officer's dog was trained to detect narcotics. Mr. Meshal observed the subsequent canine searches through the windshield of the squad car.

33. Deputy Frink conducted his search first. He walked the dog around the semi-truck and directed the dog (by gesturing with his hand) to sniff the wheel wells, doors, and other areas of the truck.

34. After circling the semi-truck for about a minute, the Deputy Frink returned with his dog to the GSP squad car in which Mr. Meshal was seated. Deputy Frink and his dog then walked back to Mr. Meshal's semi-truck; this time accompanied by Officer Janufka.

35. As Officer Janufka watched, Deputy Frink opened the passenger side door of the semi-truck and physically lifted his dog into the cabin of the vehicle, with no apparent positive

indication from the dog. Deputy Frink then entered the truck himself. After approximately a minute and a half, Deputy Frink and his dog got back out of the truck and walked back to the squad car with Officer Janufka.

36. The female officer then approached the semi-truck with her dog. She walked her dog around the perimeter of Mr. Meshal's truck. She did not open any doors or place the dog on the stairs.

37. Mr. Meshal was allowed back out of the squad car, and he, the GSP officers on the scene, and the dog handlers engaged in conversation. Mr. Meshal was asked about his work as an independent contractor, and he explained that it was hard for him to get employment because of his status on the watchlist. He also explained that this was not the first time that he had been detained for an extended period of time because of his status on the watchlist.

38. During this conversation, Officer Janufka again told Mr. Meshal that his continued detention was "way above my head."

39. After the dog handlers departed, Officer Janufka informed Mr. Meshal that they were now "just waiting on a call from the FBI." Officer Janufka asked Mr. Meshal more questions about his religious background and travels abroad. This conversation lasted approximately ten to fifteen minutes. Then, one of the officers walked away to take a call, and when he returned, he told Mr. Meshal that he was free to go.

40. Officer Janufka removed Mr. Meshal's handcuffs. Before letting Mr. Meshal go, he handed Mr. Meshal a written warning for following another vehicle too closely.

41. Officer Janufka's assertions that the entire encounter was "over [his] head," that he was "waiting on instructions," and that he was "waiting on a call from the FBI" constitute evidence that he and the other GSP officer on the scene were acting pursuant to a GSP policy or

8

procedure directing officers to extend routine traffic stops to investigate other potential violations based solely on the detained individuals' inclusion on a federal watchlist, and/or seeking clearance from the FBI before releasing such persons from detention.

42. Mr. Meshal walked back to his truck and immediately took pictures of the written warning and his wrists where the handcuffs had left red marks.

43. Mr. Meshal noticed that there was dog hair in the cab from Deputy Frink's explosives-detection dog. Mr. Meshal's prayer mat was also covered in dog hair, and he tried to clean it off by dusting it outside the window. Mr. Meshal was upset about the dog hair on his prayer mat because, according to Islamic practice, the surface on which Muslims pray must be clean. Many Muslims, including Mr. Meshal, believe that dogs and some other animals introduce impurities and, therefore, anything that they come into contact with must be cleaned off before it can be used for ritual prayer.

44. After about five minutes of taking the photos and trying to clean off the dog hair, Mr. Meshal drove off. The entire detention took approximately one hour and thirty-one minutes.

45. Throughout the detention and afterward, Mr. Meshal felt helpless, humiliated, and depressed. Mr. Meshal feels that he cannot escape from this cycle of constantly being singled out by law enforcement because he is on the No Fly List. It makes him feel as if his rights as a U.S. citizen and a human being simply don't matter. He worries constantly about the impact of this stigma on his family and children.

46. Mr. Meshal's police encounter on January 23, 2020 was just the latest of multiple such incidents in which domestic law enforcement officers extended the duration and scope of a routine traffic stop based on Mr. Meshal's status on the watchlist. Mr. Meshal has tried multiple times to get off of the list, without success. Mr. Meshal's work as an independent contractor

requires him to drive regularly on interstate highways through Georgia. Because of his status on the watchlist, which could last for the rest of his life, Mr. Meshal is at heightened risk of extended, intrusive traffic stops and arrests—without adequate cause—whenever he drives on an interstate in or through the State of Georgia.

### *The Federal Government's Terrorist Watchlist*

47. Since at least 2009, Mr. Meshal has been on the federal government's "No Fly List," which is comprised of individuals who are barred from flying to, from, or through U.S. airspace. The Transportation Security Administration ("TSA") maintains the No Fly List, which is a subset of the federal consolidated terrorist watchlist (also known as the "Terrorist Screening Database" or "TSDB"). Because Mr. Meshal is on the No Fly List, it follows that his name is also on the consolidated watchlist.

### *Selection Criteria for the Watchlist*

48. The Terrorist Screening Center ("TSC"), which the Federal Bureau of Investigation ("FBI") administers, maintains the consolidated watchlist. The TSC describes the watchlist as a "single database that contains sensitive national security and law enforcement information concerning the identities of those who are known or reasonably suspected of being involved in terrorist activities."

49. The TSC exercises control over individuals' placement on, or removal from, the watchlist. Individuals are added to the watchlist via a "nomination" process initiated by a federal law enforcement agency, a federal intelligence agency, or a foreign government agency. Nominations with an alleged nexus to domestic terrorism are reviewed by the FBI, and nominations with an alleged nexus to international terrorism are reviewed by the National Counterterrorism Center ("NCTC").

50. The TSC reviews the nominations and makes the final decision on whether a nominated individual meets the requirements for placement on the watchlist. According to the TSC, nominations to the TSDB must meet a "reasonable suspicion" standard based on "articulable intelligence or information which, based on the totality of facts . . . reasonably warrants a determination that the subject is known or is suspected to be (or has been) knowingly engaged in conduct constituting, in preparation for, in aid of, or related to, terrorism or terrorist activities." If the TSC accepts a nomination, it creates a record in the TSDB, or master watchlist, for that individual and determines whether the individual should also be added to any of the master watchlist's subsets, including the No Fly List.

51. The TSC sends records from the TSDB to other government agencies, such as the TSA, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services, that perform screening functions, and to the National Crime Information Center ("NCIC"), which makes information available to state, local, and tribal law enforcement agencies nationwide. The TSC also shares watchlist information with at least sixty foreign governments and numerous private entities.

52. The "reasonable suspicion" standard and related watchlist criteria establish a vague, overbroad, and very low threshold for inclusion on the watchlist. Under the federal government's Watchlisting Guidance, "concrete facts are not necessary" to satisfy the "reasonable suspicion" standard, and uncorroborated information of questionable or even doubtful reliability can serve as the basis for watchlisting an individual. Under the Guidance, a single social media post or anonymous letter can satisfy the "reasonable suspicion" standard. These loose criteria give officers discretion to rely on rumor, innuendo, or false statements in

placing people on the watchlist, and the criteria significantly increase the likelihood that the watchlist includes people who are neither known nor appropriately suspected terrorists.

53. The TSC has also failed to ensure that individuals who do not meet these loose criteria are not placed on the watchlist or are promptly removed from it. Publicly available information shows that as of June 2017, the TSDB contained approximately 1,160,000 people, a number that has grown significantly and steadily since June 2013, when there were approximately 680,000 people in the TSDB. From 2008 through 2017, the TSC added a total of 1,137,254 people to the TSDB, and during that period, it rejected only 16,987 nominations—a rejection rate of only 1.4 percent. Government documents show that as of 2014, nearly half the people on the watchlist had no recognized terrorist-group affiliation. The Inspector General of the Department of Justice has criticized the TSC for employing weak quality assurance mechanisms and for failing to remove people from the watchlist when information did not support their placement on it. Public reports also confirm that the federal government has placed or retained people on watchlists, including the No Fly List, as a result of human error.

54. An individual who seeks to challenge placement, and the consequences of placement, on a watchlist may submit a standard form to the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP transmits the redress petition to the TSC, which determines whether any action should be taken regarding the individual's watchlisting status. The TSC is the final arbiter of whether the petitioning individual is retained on or removed from the master watchlist.

55. Once the TSC makes a final determination regarding an individual's status on the watchlist, it advises DHS TRIP that it has completed its process. DHS TRIP then responds to the individual with a letter that does not confirm or deny whether the person is in fact watchlisted, or

whether any watchlist records relating to the person exist. At no point in the process can an individual appear in person before a neutral decision maker to challenge placement on the watchlist or its consequences. Because the DHS TRIP process lacks critical due process safeguards, people who have been placed on the watchlist because of erroneous, unreliable, or outdated information have no meaningful opportunity to clear their names and effectuate their removal from the watchlist.

56. Mr. Meshal has petitioned for the removal of his name from the watchlist through DHS TRIP without success. He has also sought the removal of his name from the No Fly List, or a meaningful process by which to contest his status on the No Fly List, through litigation in federal court. As a result of that litigation, the federal government confirmed his status on the No Fly List but refused to remove him from it.

### *Use by State and Local Law Enforcement Agencies*

57. Officers employed by state and local law enforcement agencies can query the NCIC about individuals that they have stopped or detained. In response, officers may receive an automated message or handling code on their dashboard computers informing them that the name or other information associated with the stopped or detained individual matches that of someone on the watchlist.

58. While the *fact* that an individual may be included on the watchlist is shared with state and local law enforcement, the *reason* for an individual's inclusion is not.

59. THE NCIC's 2009 Operating Manual is publicly available and contains information about codes or messages that domestic law enforcement officers receive in response to queries to the NCIC. As of 2009, the "Code" that NCIC transmitted to domestic law

13

enforcement officers for individuals on the watchlist but not subject to an active arrest warrant or immigration detainer read as follows (emphasis added):

***LAW ENFORCEMENT SENSITIVE INFORMATION***

DO NOT ADVISE THIS INDIVIDUAL THAT THEY MAY BE ON A TERRORIST WATCHLIST. CONTACT THE TERORRIST SCREENING CENTER (TSC) AT (866) XXX-XXXX DURING THIS ENCOUNTER. **IF THIS WOULD EXTEND THE SCOPE OR DURATION OF THE ENCOUNTER CONTACT THE TSC IMMEDIATELY THEREAFTER.** IF YOU ARE A BORDER PATROL OFFICER, IMMEDIATELY CALL THE NTC.

ATTEMPT TO OBTAIN SUFFICIENT IDENTIFYING INFORMATION DURING THE ENCOUNTER, **WITHOUT OTHERWISE EXTENDING THE SCOPE OR DURATION OF THE ENCOUNTER**, TO ASSIST THE TSC IN DETERMINING WHETHER OR NOT THE NAME OR IDENTIFIER(S) YOU QUERIED BELONGS TO AN INDIVIDUAL IDENTIFIED AS HAVING POSSIBLE TIES WITH TERRORISM.

**DO NOT DETAIN OR ARREST THIS INDIVIDUAL UNLESS THERE IS EVIDENCE OF A VIOLATION OF FEDERAL, STATE OR LOCAL STATUTES.**

UNAUTHORIZED DISCLOSURE IS PROHIBITED.

INFORMATION THAT THIS INDIVIDUAL MAY BE ON A TERRORIST WATCHLIST IS PROPERTY OF THE TSC AND IS A FEDERAL RECORD PROVIDED TO YOUR AGENCY THAT MAY NOT BE DISSEMINATED OR USED IN ANY PROCEEDING WITHOUT THE ADVANCE AUTHORIZATION OF THE TSC.

WARNING – APPROACH WITH CAUTION.

***LAW ENFORCEMENT SENSITIVE INFORMATION***

60.  Significantly, the Handling Code for individuals not subject to an active arrest warrant or immigration detainer instructs domestic law enforcement officers not to extend the scope of duration of an encounter, for the purpose of contacting federal authorities or for any other reason, unless there is independent evidence of a crime.

61.  Therefore, any message or code that the NCIC transmitted to Defendant Janufka or the other Defendant officers about Mr. Meshal would likely have advised them to call the TSC during or after the stop, but *not* to extend the scope or duration of the stop unless they had some

evidence of an independent violation of federal, state, or local statutes that would justify extending the stop.

## COUNT I

### *Unlawful Seizure under 42 U.S.C. § 1983*

62. After pulling over Mr. Meshal for following another vehicle too closely, there was no reasonable suspicion or probable cause to prolong his detention past the point necessary to write him a ticket or courtesy warning for following too closely.

63. Defendants Officer Janufka, Officer Oglesby, and Deputy Frink unconstitutionally extended the scope and duration of the stop for the apparent purpose of investigating whether Mr. Meshal was transporting narcotics or explosives in his vehicle.

64. The only basis that Defendant officers articulated for extending the scope and duration of the stop was the fact of Mr. Meshal's inclusion on the watchlist.

65. Mr. Meshal's inclusion on the watchlist, standing alone, could not have supplied the Defendant officers with either reasonable suspicion or probable cause that Mr. Meshal was transporting narcotics or explosives, or was otherwise violating the law.

66. Nor, under the facts available to Defendant officers at the time of the stop, did any independent basis exist to confer reasonable suspicion, or even arguable reasonable suspicion, that Mr. Meshal was transporting narcotics or explosives, or was violating any law other than the routine traffic violation for which he was originally pulled over.

67. Accordingly, Defendant officers' decision to extend a routine traffic stop to investigate Mr. Meshal for crimes for which no reasonable suspicion or probable cause existed violated Mr. Meshal's Fourth Amendment right to be free of unreasonable searches and seizures.

68. Furthermore, Officer Janufka's assertions that the entire encounter was "over [his] head," that he was "waiting on instructions," and that he was "waiting on a call from the FBI" constitute evidence that the officers on the scene were acting pursuant to a GSP policy or procedure directing officers to extend routine traffic stops to investigate other potential violations based solely on the detained individuals' inclusion on a federal watchlist, and/or seeking clearance from the FBI before releasing such persons from detention.

69. As Commissioner of GDPS, Defendant Wright oversees the policies and procedures pertaining to traffic stops conducted by GSP officers, including the policies and procedures at issue in this case. Defendant Wright knew or should have known that a GSP policy or procedure directing officers to extend routine traffic stops to investigate other potential violations based solely on the detained individuals' inclusion on a federal watchlist, and/or seeking clearance from the FBI before releasing such persons from detention, violates the Fourth Amendment right to be free of unreasonable searches and seizures of any person detained pursuant to such a policy.

70. Defendant officers also had no reasonable suspicion or probable cause to continue detaining Mr. Meshal for an additional twenty minutes past the point at which the canine teams failed to identify any narcotics or explosives in Mr. Meshal's truck.

## COUNT 2

*Unlawful search under 42 U.S.C. § 1983*

71. Mr. Meshal did not consent to a search of his vehicle during the encounter when asked by Defendant Officer Janufka.

72. Despite lacking Mr. Meshal's consent, Defendant Deputy Frink, at the apparent invitation of Defendant Officer Janufka, opened the door to Mr. Meshal's semi-truck and entered

16

the truck cabin with his dog, despite no visible cue from the dog that it had detected contraband. Defendant Deputy Frink remained in the truck cabin with his dog for approximately two minutes under the close observation of Defendant Janufka.

73. Defendant officers' warrantless entry into Mr. Meshal's vehicle absent any evidence that the vehicle contained contraband violated Mr. Meshal's Fourth Amendment right to be free of unreasonable searches and seizures.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following:

a) That this action be tried to a jury;
b) For compensatory damages in an amount to be determined at trial;
c) For punitive damages in an amount to be determined at trial;
d) For a declaratory judgment establishing that Plaintiff's inclusion on the consolidated federal watchlist or any subset of the watchlist does not in itself constitute reasonable suspicion or probable cause to stop or arrest Plaintiff;
e) For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988;
f) That all costs of this action be taxed against Defendants; and
g) That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

A jury trial is demanded.

|  |  |
|---|---|
|  | Respectfully submitted, |
| this 20th of January, 2022 | s/ Sean J. Young<br>Attorney Bar Number: 790399<br>Andres Lopez-Delgado<br>Attorney Bar Number: 552876<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.<br>P.O. Box 77208<br>Atlanta, GA 30357<br>Telephone: 678-653-0533<br>syoung@acluga.org<br>adelgado@acluga.org<br><br>Attorneys for Plaintiffs |