## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

AMIR M. MESHAL,

      Plaintiff,

    v.

CHRISTOPHER C. WRIGHT, in his official
capacity as Commissioner of the Georgia
Department of Public Safety; JOSHUA J.
JANUFKA; KEITH OGLESBY; and
DERRICK FRINK,

      Defendants.

CIVIL ACTION NO.: 4:22-cv-10

## O R D E R

This action is before the Court on Defendants Christopher Wright, Joshua Janufka, and Keith Oglesby's Motion to Dismiss. (Doc. 14.) Plaintiff Amir Meshal commenced this action under 42 U.S.C. § 1983 following an incident involving a prolonged traffic stop and subsequent vehicle search due to Meshal's presence on a terrorist watchlist. (Doc. 1, pp. 1–2.) In the Complaint, Meshal alleges Fourth Amendment violations for his unlawful seizure and the unlawful search of his vehicle. (Id. at pp. 15–17.) Defendants Wright, Janufka, and Oglesby filed the at-issue Motion to Dismiss arguing, *inter alia*, that there was no Fourth Amendment violation and, in the alternative, that Meshal's claims are precluded by the Eleventh Amendment and qualified immunity. (See generally doc. 14.) Meshal filed a Response, (doc. 21), and Defendants filed a Reply, (doc. 23). For the reasons more fully explained below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion. (Doc. 14.) To the extent Meshal's Complaint seeks the recovery

of *damages* from Defendants Janufka and Oglesby in their official capacities, those claims are dismissed.  However, the Court **DENIES** the remainder of the Motion.

**BACKGROUND**

I.      **Meshal's Detention on January 20, 2020**

The following are the relevant facts that are set forth in the Complaint.  (Doc. 1.)  Amir Meshal is a U.S. citizen who resides in Minnesota.  (Id. at ¶ 5.)  He works as an independent contractor and contracts with companies across the country to make deliveries in his semi-truck. (Id. at ¶ 10.)  Meshal's job requires him to regularly drive on interstate highways through the state of Georgia.  (Id. at ¶ 46.)  On January 23, 2020, Meshal was driving north in his semi-truck, without a trailer attached, on Interstate 95 through Bryan County, Georgia.  (Id. at ¶ 11.)  He was returning home after a brief trip from a job delivering equipment for Super Bowl LIV in Miami Gardens, Florida.  (Id.)  At around 3:00 p.m., Meshal was stopped by Officer Joshua Janufka in Richmond Hill, Georgia.  (Id. at ¶ 12.)  Janufka is and was, at all times relevant to this action, a Georgia State Patrol ("GSP") officer.  (Id. at ¶ 6.)

Janufka approached the semi-truck and asked for Meshal's license and registration, which Meshal provided.  (Id. at ¶ 13.)  Janufka then explained that he had stopped Meshal for following too closely, and that he would be issuing a courtesy warning in lieu of a ticket.  (Id. at ¶¶ 13–14.) Janufka told Meshal that, because it was raining, they should go to Janufka's GSP squad car to talk.  (Id. at ¶ 14.)  Meshal obliged, followed Janufka to the patrol car, and entered on the front passenger side.  (Id.)  Approximately four minutes later, Officer Keith Oglesby arrived at the scene and pulled up behind Janufka's vehicle.  (Id. at ¶ 16.)  Oglesby was, at all times relevant to this action, a GSP officer.  (Id. at ¶ 7.)  Janufka then asked Meshal a series of questions that Meshal interpreted as standard questions asked to truck drivers during traffic stops to ensure that they are

complying with regulations.  (Id. at ¶ 17.)  Meshal explained that he was returning from a delivery in Miami, with goods he picked up in Delaware.  (Id.)  He provided Janufka the bill of lading from the delivery to confirm the job, and explained that, after he dropped off the delivery, he stayed with his mother in Florida for two nights before heading to his next trip in New Jersey.  (Id.)

Janufka continued questioning Meshal and asked if Meshal had ever been arrested.  (Id. at ¶ 18.)  Meshal responded that he had been arrested a long time ago and believed it to be for driving on a suspended license.  (Id.)  Janufka then asked Meshal if he would consent to a search of the semi-truck.  (Id. at ¶ 19.)  Meshal declined and asked Janufka why he wished to search the vehicle. (Id. at ¶ 20.)  Janufka did not respond to the question, but asked again for Meshal's consent to search the vehicle, which Meshal again refused.  (Id.)  Janufka then called for a K-9 unit.  (Id. at ¶ 21.)  Janufka thereafter instructed Meshal to exit the vehicle because "something was wrong," and he needed to detain Meshal as a result.  (Id. at ¶ 22.)

Meshal was then made to place his hands on the roof of the squad car, and Janufka performed a pat-down on him and removed his cellphone.  (Id. at ¶ 23.)  Meanwhile, Oglesby continued asking Meshal questions about his personal information, which Meshal answered.  (Id.) Janufka then brought one of Meshal's hands behind his back and began to handcuff him.  (Id. at ¶ 24.)  When Meshal asked what he was doing, Janufka replied, "you're not under arrest but I have to detain you."  (Id.)  Meshal then brought his other hand down and allowed Janufka to handcuff him.  (Id.)  Janufka next placed Meshal in the back of the squad car.  (Id. at ¶ 25.)  Janufka then closed the door and told Meshal to "just hang tight."  (Id.)  By this point, at least thirty minutes had passed since the traffic stop was initiated.  (Id. at ¶ 27.)

Once placed in the back of the squad car, Meshal had a view of the squad car's computer system, and he saw the word "terrorist" on the screen.  (Id. at ¶ 28.)  Meshal then asked Janufka if

he was being detained because of his presence on a watchlist, to which Janufka replied "exactly." (Id. at ¶ 29.)  Meshal subsequently proffered details surrounding the context of his presence on the No-Fly List, explaining that he was placed on the list for refusing to work as an FBI informant during his time in Somalia.  (Id.)  Janufka simply replied, "This is over my head.  I'm getting instructions on what to do."  (Id.)  Janufka then continued to question Meshal, inquiring whether Meshal had any explosives, drugs, weapons, or anything else law enforcement should be concerned about, to which Meshal replied that he did not.  (Id. at ¶ 30.)  Janufka told Meshal at multiple points during Meshal's detention that he was waiting on a call from the FBI for guidance about whether to arrest Meshal.  (Id. at ¶¶ 31, 39.)

Approximately thirty minutes after Meshal was handcuffed and placed in the back of the squad car—and approximately one hour after his initial stop—two additional officers arrived with dogs trained to detect explosives and narcotics.  (Id. at ¶ 32.)  The first officer, Deputy Derrick Frink, conducted the first search of the semi-truck by walking his dog around the exterior of the truck.  (Id. ¶ 33.)  He then conducted a second canine search accompanied by Janufka, during which both the dog and Frink entered the interior of the truck.  (Id. at ¶¶ 34–35.)  In this search, Frink opened the passenger side door of Meshal's truck, physically lifted the dog into the cabin, and then also entered the vehicle himself.  (Id. at ¶ 35.)  With no apparent positive notification from the dog, Frink and the dog exited the vehicle and returned with Janufka to the squad car.  (Id.)  The second officer then conducted an additional search of the truck's exterior and returned to join the other officers outside the squad car.  (Id. at ¶¶ 36–37.)

Following the searches, the officers allowed Meshal to leave the squad car but did not remove his handcuffs.  (Id. at ¶ 37.)  The officers further questioned Meshal about his work, and Meshal continued to respond to their questions.  (Id.)  After the dog handlers left, Janufka informed

Meshal that they were "just waiting on a call from the FBI" and asked even more questions concerning Meshal's religious background and travels abroad.  (Id. at ¶ 39.)  About ten to fifteen minutes later, one of the officers stepped away to take a call.  (Id.)  When he returned, he told Meshal he was allowed to leave.  (Id.)  Janufka then removed Meshal's handcuffs and handed him a written warning for following too closely.  (Id. at ¶ 40.)  At this point Meshal had been detained for approximately one hour and thirty-one minutes.  (Id. at ¶ 44.)

## II.     Meshal's Presence on the No-Fly List

According to the Complaint, Meshal has been on the No-Fly list since 2009, following an incident in which he was detained in Somalia by Kenyan authorities working with federal law enforcement agencies and he refused the FBI's requests that he work as an informant.  (Id. at ¶¶ 29, 47.)  He has petitioned, unsuccessfully, to be removed from the list.  (Id. at ¶ 46.)  According to the Complaint, the January 2020 incident at issue in this case is the most recent of "multiple such incidents" that Meshal has been subjected to due to his presence on the "No-Fly List."  (Id. at ¶ 46.)

The "No-Fly List" is a subset of the Terrorist Screening Database ("TSDB"), or the terrorist watchlist.  (Doc. 1, ¶ 47; doc. 14-1, p. 2); see Terrorist Screening Center, Federal Bureau of Investigation, https://www.fbi.gov/investigate/terrorism/tsc, last visited Dec. 28, 2022.  According to the parties in this case, state and local law enforcement officers can search for an individual by name through the National Crime Information Center ("NCIC") to determine whether they are listed on a watchlist; if the individual is on such a list, the NCIC sends an automated message to the officer disclosing that information.  (Doc. 1, ¶ 57; doc. 14-1, p. 2.)  The only information conveyed to the officer, however, is the individual's presence on the list; the reason for their

placement on the list is not shared.  (Doc. 1, ¶ 58; doc. 14-1, p. 2.)  If the individual is on a watchlist,

the notification that officers receive reads in full:

> ***LAW ENFORCEMENT SENSITIVE INFORMATION***
>
> DO NOT ADVISE THIS INDIVIDUAL THAT THEY MAY BE ON A TERRORIST WATCHLIST. CONTACT THE TERORRIST SCREENING CENTER (TSC) AT (866) XXXXXXX DURING THIS ENCOUNTER. IF THIS WOULD EXTEND THE SCOPE OR DURATION OF THE ENCOUNTER CONTACT THE TSC IMMEDIATELY THEREAFTER. IF YOU ARE A BORDER PATROL OFFICER, IMMEDIATELY CALL THE NTC.
>
> ATTEMPT TO OBTAIN SUFFICIENT IDENTIFYING INFORMATION DURING THE ENCOUNTER, WITHOUT OTHERWISE EXTENDING THE SCOPE OR DURATION OF THE ENCOUNTER, TO ASSIST THE TSC IN DETERMINING WHETHER OR NOT THE NAME OR IDENTIFIER(S) YOU QUERIED BELONGS TO AN INDIVIDUAL IDENTIFIED AS HAVING POSSIBLE TIES WITH TERRORISM.
>
> DO NOT DETAIN OR ARREST THIS INDIVIDUAL UNLESS THERE IS EVIDENCE OF A VIOLATION OF FEDERAL, STATE OR LOCAL STATUTES.
>
> UNAUTHORIZED DISCLOSURE IS PROHIBITED.
>
> INFORMATION THAT THIS INDIVIDUAL MAY BE ON A TERRORIST WATCHLIST IS PROPERTY OF THE TSC AND IS A FEDERAL RECORD PROVIDED TO YOUR AGENCY THAT MAY NOT BE DISSEMINATED OR USED IN ANY PROCEEDING WITHOUT THE ADVANCE AUTHORIZATION OF THE TSC.
>
> WARNING – APPROACH WITH CAUTION.
>
> ***LAW ENFORCEMENT SENSITIVE INFORMATION***

(Doc. 1, ¶ 59; doc. 14-1, pp. 2–3); see also NCIC 2000 Operating Manual (Aug. 2, 2009), No.

NCIC-VGTOF-707, p. 24, https://www.mass.gov/files/documents/2019/01/16/NCIC%202000%

20Operating%20Manual_0.pdf, last visited Dec. 28, 2022.  Meshal alleges that this is the

notification that Janufka received when Meshal was stopped.  (Doc. 1, ¶ 61.)

### III.    Procedural History

Meshal filed this suit[1] on January 20, 2022.  (Id.)  The Complaint brings claims pursuant to 42 U.S.C. § 1983, alleging that Defendants Janufka, Oglesby, and Wright violated Meshal's Fourth Amendment rights by conducting an unlawful seizure (based on the length of time and manner in which Meshal was detained), and that Defendants Janufka and Oglesby conducted an unlawful search of Meshal's vehicle.  (Id. at pp. 15–17.)  It appears from the face of the Complaint that Meshal's claims are asserted against Janufka and Oglesby in both their official as well as their individual capacities, while his claim against Wright is asserted against him in his official capacity only.  (Id. at ¶¶ 6–8.)  Wright is and was, at all times relevant to this action, Commissioner of the Georgia Department of Public Safety ("GDPS"), which requires him to "supervise, direct, account for, organize, plan, administer, and execute the functions vested in the department by law."  (Id. at ¶ 8.); O.C.G.A. § 35-2-3.  Because GSP is a division of GDPS, Wright oversees the policies and procedures pertaining to traffic stops conducted by GSP officers.  (Doc. 1, ¶¶ 8, 69); O.C.G.A. § 35-2-30.  Meshal's claims against Defendants in their official capacities are based on his allegation that GSP continues to commit Fourth Amendment unlawful seizure violations pursuant to a GSP policy that uses presence on a watchlist as a substitute for reasonable suspicion or probable cause.  (Id. at ¶¶ 68–69.)  According to the Prayer for Relief section of the Complaint, Meshal seeks compensatory and punitive damages, attorneys' fees and costs, and a "declaratory judgment establishing that [his] inclusion on the consolidated federal watchlist or any subset of the watchlist does not in itself constitute reasonable suspicion or probable cause to stop or arrest [him]."  (Id. at p. 17.)

---

[1]  This Motion to Dismiss was brought by Defendants Wright, Janufka, and Oglesby only.  Defendant Frink filed an Answer to the Complaint on February 18, 2022, before this Motion to Dismiss was filed with the Court.  (Doc. 6.)  Frink did not join in this Motion and has not filed a separate Motion to Dismiss.  Accordingly, the Court's ruling in this case does not affect the status of Meshal's claim against Frink.

Defendants Wright, Janufka, and Oglesby filed this Motion to Dismiss on April 22, 2022. (Doc. 14.)  In their Motion, they argue, *inter alia*, that they did not commit any Fourth Amendment violations, and, alternatively, that Meshal's claims against them are barred by the Eleventh Amendment and qualified immunity.  (Id.)  Meshal filed a Response, (doc. 21), and the moving Defendants filed a Reply, (doc. 23).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft, 556 U.S. at 678.  Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Ashcroft, 556 U.S. at 678 (internal quotation marks and

citation omitted).  Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

## DISCUSSION

### I. Whether Meshal's Claims against Defendants in their Official Capacities are Barred by the Eleventh Amendment

#### A. The Eleventh Amendment Precludes Recovery of Monetary Damages against Officers Janufka and Oglesby in their Official Capacities.

Defendants first argue that the Eleventh Amendment prevents Meshal from suing Janufka and Oglesby for damages in their official capacities, and thus any claim for damages against them in their official capacities must be dismissed.  (Doc. 14-1, pp. 6–7.)  Defendants are correct.

The Eleventh Amendment protects a state from being sued in federal court without the state's consent.  U.S. Const. amend. XI.  It likewise protects state officials from suit in their official capacities, so long as they are acting as an "arm of the state."  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003); see also Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005) ("When an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent.") (internal quotations omitted).  Both Janufka and Oglesby clearly fall within the definition of an "arm of the state" as both are GSP officers and members of the GDPS.  See O.C.G.A. § 35-2-30; Manders, 338 F.3d at 1312, n.16.  While the Complaint makes clear that no damages are being sought against Defendant Wright in his individual capacity, no such statement is included regarding Defendants Janufka and Oglesby.  Nonetheless, in his Response to

Defendants' Motion to Dismiss, Meshal has conceded "that he cannot recover damages against [Defendants] Janufka and Oglesby in their official capacities." (See doc. 21, p. 22.) Thus, Meshal seeks to recover damages from Officers Janufka and Oglesby only in their *individual* capacities, and, as discussed more fully below, he seeks to recover only prospective equitable relief against them in their *official* capacities. (Id.) In sum, to the extent Meshal's Complaint seeks the recovery of *damages* from Defendants Janufka and Oglesby in their official capacities, such claims for relief are dismissed.

      **B.**      **Meshal Has Adequately Pled an Ongoing Constitutional Violation to Support his Claim for Prospective Declaratory Relief.**

In the Complaint, Meshal asserts claims against Janufka, Oglesby, and Wright in their official capacities, seeking "a declaratory judgment establishing that [Meshal's] inclusion on the consolidated federal watchlist or any subset of the watchlist does not in itself constitute reasonable suspicion or probable cause to stop or arrest [Meshal]." (Doc. 1, p. 17.) Meshal seeks this remedy to prevent GSP officers from continuing to use presence on the watchlist alone to justify detentions and searches—in other words, to prevent GSP from "enforcing unlawful detention policies" based on the watchlist. (Doc. 21, p. 22.) In their Motion to Dismiss, Defendants argue that the Eleventh Amendment bars this "official capacity" claim for prospective relief against GSP. (Doc. 14-1, pp. 15–18.)

As already noted, the Eleventh Amendment generally prevents a state or state official from being sued in federal court absent their consent. However, under the narrow exception carved out by the Supreme Court of the United States in Ex parte Young, 209 U.S. 123 (1908), a plaintiff can sue a state official in their official capacity in order to seek prospective injunctive relief. See id. at 154 ("[A] suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff[] is not a suit

against the State within the meaning of [the Eleventh] Amendment.").  Such suits must be allowed to proceed notwithstanding the Eleventh Amendment to ensure that states are not violating the constitution.  See Green v. Mansour, 474 U.S. 64, 68 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

To invoke the Young exception, "[a]n allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient."  Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997).  The Court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (internal quotations omitted).  Notably, the relief must be forward-looking, and the exception "is inapplicable when a plaintiff seeks 'to adjudicate the legality of past conduct.'"  Nicholl v. Att'y Gen. Ga., 769 Fed. App'x 813, 815 (11th Cir. 2019) (quoting Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1337 (11th Cir. 1999)).  Therefore, while the Eleventh Amendment bars suits against state officials in federal court seeking retrospective or compensatory relief, it "does not generally prohibit suits seeking only prospective injunctive or declaratory relief."  Pryor, 180 F.3d at 1337.  Accordingly, for Meshal's claims against Defendants in their official capacities to survive Defendants' Motion to Dismiss, he must be seeking *future* relief from Defendants' *ongoing* unlawful conduct.

In the Complaint, Meshal alleges that GSP has—and Defendants were acting pursuant to—a "policy or procedure directing officers to extend routine traffic stops to investigate other potential violations based solely on the detained individuals' inclusion on a federal watchlist, and/or seeking clearance from the FBI before releasing such persons from detention," (doc. 1, ¶ 68), and he seeks

a "declaratory judgment establishing that [his] inclusion on the consolidated federal watchlist or any subset of the watchlist does not in itself constitute reasonable suspicion or probable cause to stop or arrest [him]," (id. at p. 17).  Defendants, however, argue that Meshal has failed to plead a "continuing violation of his rights," and thus the Young exception is inapplicable.[2]  (Doc. 14-1, p. 17; see id. at pp. 17–18.)  Defendants reason that the alleged conduct at issue cannot be considered a continuing violation because the Complaint fails to allege that GSP has continued to stop Meshal due to his presence on the watchlist and fails to specifically allege any prior detentions of Meshal by GSP.  (Id. at p. 17.)  Defendants misunderstand what is required under Young.

Defendants are correct that to invoke the Young exception, a plaintiff must plead a continuing or "ongoing" violation of law.  See Papasan v. Allain, 478 U.S. 265, 277–78 (1986) ("Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past.")  However, Defendants read the ongoing requirement too narrowly.  Neither of the objections that Defendants raise—that Meshal has not alleged that GSP continues to detain him for presence on the watchlist nor has he alleged a specific pattern of previous GSP detentions—are requirements to show an ongoing violation of law under Young.  As the Eleventh Circuit Court of Appeals has noted, the ongoing violation requirement "does not mean that the enforcement of the allegedly unconstitutional state [action] actually must be in progress against the particular

---

[2] Defendants make two additional arguments against the applicability of the Young exception: (1) that the relief sought is against the NCIC and not GSP and (2) that there is no Fourth Amendment violation.  (Doc. 14-1, pp. 16–17.)  Defendants' first argument has no merit, as the relief sought in the Complaint is not removal from the No-Fly List, but an end to a *GSP policy* that uses presence on the list as a metric to justify unlawful searches and seizures.  (See doc. 1, ¶¶ 41, 68, 69.)  As for Defendants' second argument, this is aimed at the merits of Meshal's Fourth Amendment claim.  However, "the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim."  Verizon Md., 535 U.S. at 646.  Accordingly, the Court will not rule on the merits of Meshal's claims in determining whether Meshal has adequately sought prospective injunctive relief in the Complaint.

plaintiffs initiating suit." <u>Pryor</u>, 180 F.3d at 1338.  Indeed, "[t]he <u>Ex parte Young</u> doctrine does not demand that a plaintiff first risk the sanctions of imminent prosecution or enforcement in order to test the validity of a state law." <u>Id.</u>  The requirement to show an ongoing violation is simply meant to "distinguish[] between cases where the relief sought is prospective in nature, i.e., designed to prevent injury that will occur in the future, and cases where relief is retrospective." <u>Id.</u>  More simply put, this requirement is merely meant to prevent adjudication of cases where there is no future relief sought.  <u>See, e.g.</u>, <u>Green</u>, 474 U.S. at 73 (finding that the ongoing requirement was not satisfied because there "was no threat of state officials violating the repealed law in the future").

Meshal's claims against Defendants in their official capacities are targeted at ending an alleged department policy.  (Doc. 1, ¶¶ 29, 41, 68, 69.)  Meshal's entire argument for this conduct to fit within the <u>Young</u> exception is that GSP officers will continue to follow this policy to police in a manner that violates his Fourth Amendment rights.  His request to end the alleged department policy is necessarily forward-looking.  <u>See</u> <u>Freedom From Religion Found. v. Abbott</u>, 955 F.3d 417, 424–25 (5th Cir. 2020) (finding plaintiff adequately showed an ongoing violation by alleging a department policy that would reject secular displays of nativities in violation of the First Amendment); <u>People for the Ethical Treatment of Animals, Inc. v. Banks</u>, No. 4:20-cv-02913, 2022 WL 4021938 (S.D. Tex. Sept. 2, 2021) (finding plaintiff had sufficiently alleged an ongoing violation by challenging defendants' social media policy plaintiff alleged was in place); <u>cf.</u> <u>Fincher v. Ga. Dep't of Corr.</u>, No. 1:19-cv-4560-MLB, 2021 WL 6143763, at *3 (N. D. Ga. Nov. 15, 2021) (rejecting plaintiffs' <u>Ex parte Young</u> argument because they "[did] not allege a custom or policy of ongoing violations").

"Simply put, official-capacity actions for prospective relief from unconstitutional state policies or customs are not treated as actions against the state for purposes of the Eleventh Amendment." Smith v. Comm'r of Ga. Dep't of Pub. Safety, 673 F. Supp. 446, 452 (M.D. Ga. 1987).  As Meshal alleges that Defendants acted pursuant to an unlawful GSP policy, he has sufficiently alleged that GSP's constitutional violations are "ongoing" within the Young definition. Therefore, because Meshal's requested relief of a declaratory judgment is aimed to ensure that Defendants do not continue to violate the Fourth Amendment, the relief can be adequately characterized as prospective, and his claim against the officers in their official capacities is allowed to proceed under the Young exception.  209 U.S. at 155–56 ("[O]fficers . . . who threaten . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.").

## II.      Whether the Complaint Sufficiently Alleges Fourth Amendment Violations

### A.      The Complaint Adequately Alleges an Unlawful Seizure in Violation of the Fourth Amendment.

Defendants argue that the Complaint fails to adequately allege that Defendants unlawfully seized Meshal in violation of the Fourth Amendment.  (Doc. 14-1, pp. 7–10.)  The Court disagrees. Viewing the allegations in the light most favorable to Meshal, the Complaint plausibly alleges that Defendants violated Meshal's Fourth Amendment rights when they detained him for an hour and a half based solely upon his presence on the No-Fly List.

#### (1)      Probable cause warranting the traffic stop cannot justify the prolonged detention described in the Complaint.

Defendants argue that no Fourth Amendment violation occurred simply because Meshal was initially stopped for a traffic violation, which was supported by probable cause to believe that Meshal was following too closely.  A temporary detention of an automobile by law enforcement

officers, "even if only for a brief period and for a limited purpose, constitutes a seizure of persons" and, accordingly, must comply with restraints of the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809–10 (1996); see United States v. Braddy, 11 F.4th 1298, 1308 (11th Cir. 2021). A traffic stop is thus "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  Whren, 517 U.S. at 810; see U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.").  An officer's decision to stop a vehicle is reasonable where the officer has probable cause to believe that a traffic violation has occurred.  Whren, 517 U.S. at 810.

Once an officer has made a valid seizure for a traffic violation, the officer may then investigate "to address the traffic violation that warranted the stop and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. 348, 354 (2015) (internal citation omitted).  An officer is even permitted to "conduct certain unrelated checks during an otherwise lawful traffic stop."  Id. at 355.  However, while "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure," such inquires cannot "measurably extend the stop's duration."  Arizona v. Johnson, 555 U.S. 323, 325 (2009); United States v. Cantu, 227 Fed. App'x 783, 785 (11th Cir. 2007) ("The officer can lawfully ask questions, even questions not strictly related to the traffic stop . . . so long as it does not 'prolong[] beyond the time reasonably required to complete that mission.'") (quoting Illinois v. Caballes, 543 U.S. 403, 407 (2005)).  In other words, while unrelated inquiries and checks are not necessarily unlawful, an officer's "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed."  Rodriguez, 575 U.S. at 354 (emphasis added).  If the officer goes beyond the scope of addressing the traffic violation, he or she needs an additional Fourth Amendment justification.  See id. at 355.

Defendants argue that all of the officers' actions alleged in the Complaint are justified by the probable cause that warranted Meshal's initial detention for a traffic violation. (Doc. 14-1, pp. 9–10.) The facts alleged in the Complaint do not support such a finding. According to the Complaint, Janufka pulled Meshal over, approached the vehicle, and immediately told Meshal that he would be receiving a courtesy warning for following too closely. (Doc. 1, p. 4.) Accordingly, the seizure was only justified for "the time reasonably required to complete the mission of issuing a warning ticket." Rodriguez, 575 U.S. at 354–55. However, the Complaint states that Janufka then asked Meshal to accompany him back to the GSP squad car where he engaged Meshal in a series of interrogations. Thereafter, according to the Complaint, Meshal was patted down, cuffed, and placed in the back of the squad car (where he remained while officers searched his vehicle), resulting in a total detention period of one hour and thirty-one minutes. (Doc. 1, pp. 5–9.) Even assuming that Janufka had the requisite probable cause to make the initial traffic stop,[3] Meshal has plausibly alleged that the length and nature of the detention went well beyond the scope of issuing a warning ticket. Cf. United States v. Foster, No. 1:19, cr-00308-AT-RGV, 2022 WL 4359082, at *3 (N.D. Ga. July 27, 2022) (finding that because the K-9 unit arrived on the scene within the *two and a half to eleven minute* period after the initial stop in which the officer was still issuing the

---

[3] In his brief in opposition to Defendants' Motion to Dismiss, Meshal went so far as to argue that Janufka lacked probable cause at the outset for the initial stop, because, he said, the only facts alleged in the Complaint relating to probable cause were that it was raining and that Meshal received a courtesy warning. (Doc. 21, pp. 10–11.) However, the Complaint fails to allege any facts that could lead to the conclusion that Meshal was initially stopped for something other than following too closely. For instance, at no point does the Complaint allege that Meshal was not following too closely, nor does it suggest any alternative reason motivating the initial stop. A court is allowed to draw reasonable inferences based on the facts in a complaint. Doe v. Samford Univ., 29 F.4th 675, 686 (11th Cir. 2022) ("[C]ourts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer."). Here, Meshal has alleged that he was stopped while driving at night in the rain and told he would be issued a warning for following too closely. (Doc. 1, p. 4.) In the absence of any other allegations supporting a reasonable alternative inference, the Complaint does not plausibly show that Janufka lacked probable cause for the stop.

warning citation for following too closely, the use of the dog on the exterior of the vehicle did not

exceed the bounds of the initial stop); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir.

2001) (writing the warning and running computer checks on the driver within *fourteen minutes*).

Consequently, Defendants must show an independent basis to justify the prolonged traffic stop.

> **(2)    The Complaint does not show that the officers had reasonable suspicion to support an investigatory detention.**

Alternatively, Defendants argue that the encounter was an investigatory detention that was

justified by reasonable suspicion[4] that Meshal was engaged in criminal activity.  (Doc. 14-1, pp.

9–10.)  An officer is permitted to conduct a brief investigatory detention—also known as a Terry

stop—"if the officer has a reasonable suspicion supported by articulable facts that criminal activity

'may be afoot,' even if the officer lacks probable cause."  United States v. Sokolow, 490 U.S. 1, 7

(1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); United States v. Perkins, 348 F.3d 965, 970

(11th Cir. 2003) ("A traffic stop may be prolonged where an officer is able to articulate a

reasonable suspicion of other illegal activity beyond the traffic offense.").  Reasonable suspicion

requires a "minimal level of objective justification" for making a stop—"something more than an

'inchoate and unparticularized suspicion or hunch.'"  Sokolow, 490 U.S. at 7 (quoting Terry, 392

U.S. at 27).  Defendants argue they had reasonable suspicion to make an investigatory detention

---

[4] Meshal additionally argues that his prolonged detention was converted into a full-scale or *de facto* arrest that needed to be supported by probable cause.  (Doc. 21, p. 9.)  While there is no precise time-limit on how long an investigatory detention may last, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."  United States v. Place, 462 U.S. 696, 709 (1983); see id. at 709–10 (finding an hour and a half detention to exceed the bounds of an investigatory detention); cf. Purcell, 236 F.3d at 1277–79 (finding that waiting an extra three minutes for criminal history information in a routine computer check was a *de minimis* extension of writing the warning ticket).  Here, Defendants extended a routine traffic stop to issue a warning citation for following too closely into an hour and a half endeavor during which Meshal was handcuffed and placed in the back of a squad car.  However, the Court need not split hairs at this time as to whether Meshal's detention amounted to a full-scale or *de facto* arrest because, under the facts pled in the Complaint, Defendants have not met the lower threshold of reasonable suspicion to justify an investigatory detention.

based on Meshal's presence on the terrorist watch-list, his "evasiveness and lack of candor," and his having recently made a delivery at the site of the Super Bowl.  (Doc. 14-1, p. 9.)  The Court finds that these assertions—even assuming they are supported by the allegations in the Complaint—are insufficient to support a finding of reasonable suspicion at this stage.

First, accepting Defendants' interpretations of Meshal's behavior requires reading the Complaint with inferences drawn in *Defendants'* favor, effectively inverting the motion to dismiss standard.  Construing the Complaint in *Meshal's* favor, as the Court must, there is simply no indication of "evasiveness or lack of candor."  To the contrary, the Complaint asserts that Meshal cooperated and engaged with officers at all points of the interaction; he agreed to talk in the GSP squad car upon Janufka's request, consistently answered all of the officers' questions, and cooperated when being placed in handcuffs.  See United States v. Heard, 725 Fed. App'x 743, 752–54 (11th Cir. 2018) (finding articulable reasonable suspicion did not exist at inception of Terry stop where facts showed the individual "remained calm, provided identification, and willingly answered questions").  Specifically, although the Complaint indicates that Meshal did not immediately disclose his presence on the watchlist, there is no indication that he was asked about it,[5] and when he did realize why the officers were continuing to detain him, he was immediately candid about the circumstances surrounding his presence on the list.  (See doc. 1, ¶ 29.)  There is no reading of the Complaint regarding Meshal's demeanor that would give an officer any articulable facts to support reasonable suspicion.  Additionally, even if the Complaint somehow did support Defendants' characterization of Meshal's demeanor, the Eleventh Circuit has repeatedly found that nervousness or failure to answer questions in the presence of police is

---

[5] Defendants base their finding of Meshal's "evasiveness and lack of candor" on his failure to disclose his presence on the watch list when asked if he had previously been arrested.  (Doc. 14-1, p. 9.)  Meshal's presence on the watch list is not the result of a previous arrest and thus his failure to respond with this information does not equate to him being "evasive."

insufficient to warrant a finding of reasonable suspicion.  See Perkins, 348 F.3d at 970 (finding the plaintiff's nervousness, "odd behavior," and inconsistent statements about where he lived and to where he was traveling were insufficient to lead to reasonable suspicion).

Second, to the extent that Defendants base their actions on Meshal's recent trip to Florida, unusual travel plans do not provide a sufficient basis for an articulable suspicion.  See Evans v. Stephens, 407 F.3d 1272, 1280 (11th Cir. 2005) (finding that traveling in a rental car with unusual travel plans, even when combined with a nervous driver, did not provide reasonable suspicion). Moreover, Meshal alleged that he specifically explained why he made the trip to Miami Gardens, and even provided the officers with the bill of lading from the delivery to corroborate his story. Even if Meshal's travel did initially raise suspicion in the officers' view, once Meshal explained the situation, any "suspicious inconsistencies virtually evaporated and any justification . . . for further investigation [based on the travel plans] dissipated."  United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003); see id. (finding that the driver's explanation of his unusual travel plans negated any suspicion that the officers might have had that criminal activity was afoot); accord United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) (finding that once the driver explained the strange travel plans, the officers' suspicions should have been extinguished).

Thus, the only potential basis for Defendants' reasonable suspicion is Meshal's presence on the No-Fly List.  According to the Complaint, in order for a person to be placed on a watchlist in the TSDB, such as the No-Fly List the TSC generally accepts nominations on a showing of "reasonable suspicion" that the individual is a known or suspected terrorist based on the totality of the information.  (Doc. 1, ¶¶ 49–50.)  Reasonable suspicion for purposes of placing an individual on the list, however, does not necessarily amount to reasonable suspicion that the individual is currently engaged in terrorist activity.  Furthermore, here, upon learning that Meshal was on the

No-Fly List, the Defendant officers then received an automated notification from NCIC.  (Doc. 1, ¶¶ 57–61; doc. 14-1, pp. 2–3.)  The notification indicated that an individual's presence on the watchlist does not provide a basis for detaining or arresting the individual, and it instructed the officers to not "extend[] the scope or duration of the encounter."  (Doc. 1, ¶ 59; see id. ("Do not detain or arrest this individual unless there is evidence of a violation of federal, state[,] or local statutes.").)  Despite this notification instructing officers not to use an individual's presence on the watch list as a basis for extending the duration of an encounter, the Complaint shows that the officers did exactly that when they placed Meshal in handcuffs, put him in the back of Janufka's squad car, and detained him for a total of one hour and thirty-one minutes.  Notably, Defendants do not argue that some law or regulation, or some other authority, provided them with a basis to disregard or defy the NCIC's statements and instructions.

In sum, the Complaint shows that Defendants detained Meshal based simply on his travel history (which he demonstrated the legitimacy of through business records) and the fact that he was included on an FBI watchlist (despite specific instructions from the NCIC that he not be further detained solely based on his presence on the list).  These facts "do not support anything more than an 'inchoate hunch' that criminal activity other than [following too closely] was afoot."  United States v. Henderson, No. 2:20-cr-28, 2021 WL 3684149, at *15 (S.D. Ga. May 12, 2021).  Accordingly, the Complaint adequately alleges that Defendants' detention of Meshal was unreasonable under the circumstances in violation of the Fourth Amendment.

### B. The Complaint Adequately Alleges an Unlawful Search in Violation of the Fourth Amendment.

Defendants additionally argue that Meshal failed to plausibly allege that the officers conducted an unlawful search of his semi-truck in violation of the Fourth Amendment.  (Doc. 14-1, pp. 10–12.)  The Court disagrees.  Generally, the Fourth Amendment requires officers to obtain

a warrant supported by probable cause before searching a person's property.  See United States v. Wilson, 979 F.3d 889, 910 (11th Cir. 2020).  Defendants did not have a warrant when they searched Meshal's semi-truck and, therefore, they attempt to invoke the automobile exception to the warrant requirement.  (Doc. 14-1, pp. 10–12.)  Under the automobile exception to the Fourth Amendment, "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so."  Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018); United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) (allowing police officers to search an automobile if "(1) the vehicle is readily mobile; and (2) the police have probable cause for the search").  Probable cause to search a vehicle exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  Ornelas v. United States, 517 U.S. 690, 696 (1996); see also United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006) ("[A] vehicle search will not violate the Fourth Amendment if . . . under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle.") (internal quotations omitted).

Defendants argue that the same circumstances that supported their detention of Meshal likewise supported their warrantless search of his vehicle.  (Doc. 14-1, pp. 11–12.)  As discussed in Discussion Section II.A(2), supra, the facts alleged in the Complaint do not support a finding of reasonable suspicion.  Thus, the same facts necessarily cannot support the higher threshold requirement of probable cause.  See Cyeef-Din v. Onken, 586 F. Supp. 3d 1139, 1150–51 (D.N.M. 2022) (even where an individual was on a terrorist watchlist, was known to be armed, had a violent criminal history, had an FBI hold, and was reported to police as behaving suspiciously, officers did not have probable cause to believe criminal activity was afoot).  Defendants have provided no evidence as to why Meshal's presence on the watchlist and his having made a delivery to the Super

Bowl would provide the officers with a basis to conclude, by "a fair probability," that they would discover contraband in the truck.  Tamari, 454 F.3d at 1264.  Meshal's mere inclusion on a watchlist gave Defendants no indication that they should be looking for any type of contraband.  See United States v. Ross, 456 U.S. 798, 824 (1982) (noting that the scope of a warrantless search is defined by the object of the search).  Accordingly, Meshal has sufficiently alleged that Defendants violated his Fourth Amendment rights by conducting a warrantless search of his semi-truck absent probable cause.

## III.   Whether Officers Janufka and Oglesby are Entitled to Qualified Immunity

Finally, Defendants contend that, even if Meshal plausibly alleged Fourth Amendment violations by Janufka and Oglesby, Meshal's claims against them in their individual capacities should still be dismissed because they are entitled to qualified immunity.  (Doc. 14-1, pp. 12–15.)  Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Harris v. Coweta Cnty., 433 F.3d 807, 811 (11th Cir. 2005).  To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).  If the defendant can establish that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  Id.; see also Bradley v. Tucker, No. 4:14-CV-165, 2015 WL 64944, at *8 (S.D. Ga. Jan. 5, 2015) ("[O]nce a defendant raises the issue of qualified immunity, the burden is on the plaintiff to marshal facts sufficient to show a plausible violation of clearly established law.").  Meshal does not contest that Defendants Janufka and Oglesby were acting within the scope of their

discretionary authority as law enforcement officers at the time of the incident. (Doc. 21, p. 19.) Accordingly, the burden shifts to Meshal to show that qualified immunity is not appropriate.

Determining whether qualified immunity is appropriate is a two-step inquiry. First, the Court must determine "whether the plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002). If a plaintiff can show a constitutional violation, the court then must consider whether the right violated was "clearly established." Vinyard, 311 F.3d at 1346; Saucier v. Katz, 533 U.S. 194, 201 (2001). As explained in Discussion Section II, supra, Meshal has sufficiently alleged that Defendants violated the Fourth Amendment by detaining him and searching his truck without reasonable suspicion or probable cause. Therefore, the Court must examine the Complaint to determine "whether, under the most favorable version of the facts alleged, [Defendants'] actions violate clearly established law." Fortner v. Thomas, 983 F.2d 1024, 1028 (11th Cir. 1993).

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'" Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). To determine whether the officer violated a clearly established right, the Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "The very action in question does not have to have been previously held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law." Coweta Cnty., 21 F.3d at 393. "At its core, the question is one of fair notice," of whether preexisting law "put the officer on notice that his conduct [was] clearly unlawful." Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012). Plaintiffs can show that a government official was on notice for the unlawful conduct in one of three ways:

> First, the plaintiffs may show that a materially similar case has already been decided.  Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation.  Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.  Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant state supreme court].

Terrell, 668 F.3d at 1255 (internal quotations, citations, and alterations omitted).

The first method requires the Court to look at relevant case law at the time of the alleged events and determine whether "a concrete factual context [existed] so as to make it obvious to a reasonable government actor that his actions violate federal law."  Fils v. City of Aventura, 647 F3d 1272, 1291 (11th Cir. 2011).  The facts of the case need not be identical, but "the unlawfulness of the conduct must be apparent from pre-existing law."  Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011); see also Gennusa v. Canova, 748 F.3d 1103, 1113 (11th Cir. 2014) ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate.").  If these criteria are met, the conduct is deemed to violate clearly established law.

The second and third methods are known as the "obvious clarity" cases.   Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017).  These cases exist when the "constitutional provision at issue [is] so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful," or where existing case law is "so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  King v. Pridmore, 961 F.3d 1135, 1146 (11th Cir. 2020).  The Eleventh Circuit has clarified that this is a "narrow exception," and cases that fall within this exception "are rare and don't arise often."[6]  Id.  In other words, if a plaintiff cannot successfully show the law at issue was

---

[6]  Both the second and third methods are "conflated . . . and referred to . . . together as a 'narrow exception.'"  King, 961 F.3d at 1146.

clearly established under the first method, ordinarily qualified immunity is appropriate.  See

Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[A] plaintiff's citation of general rules

or abstract rights is insufficient to strip a [Section] 1983 defendant of his qualified immunity.").

### A.    Unlawful Seizure

Here, the Court need not rely on the second and third methods, as binding precedent from

the Supreme Court and the Eleventh Circuit "clearly establish[s] . . . that a detention made without

reasonable suspicion or probable cause violates the Fourth Amendment's prohibition on

unreasonable searches and seizures."  Skop v. City of Atlanta, 485 F.3d 1130, 1143 (11th Cir.

2007); see, e.g., Caballes, 543 U.S. at 407; Purcell, 236 F.3d at 1277.  As discussed in Discussion

Section II.A(2), supra, Defendants lacked the requisite reasonable suspicion to escalate the traffic

stop to an investigatory detention.  However, the issue here "is not whether reasonable suspicion

existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an

investigatory stop."  Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000).  An officer who

"reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to

qualified immunity."  Id. at 1165–66.  "A reasonable officer's awareness of the existence of an

abstract right, such as a right to be free [from] . . . an investigatory stop without reasonable

suspicion, does not equate to knowledge that his conduct infringes the right."  Id. at 1165.

However, even if the Court applies this lower threshold, the facts as alleged in the

Complaint do not support a finding of arguable reasonable suspicion.  Defendants have not

identified *any* facts in the Complaint that would have given them even arguable reasonable

suspicion that criminal activity was afoot beyond learning Meshal's name was on a terrorist

watchlist.  According to the Complaint, the officers had no information regarding the conditions

surrounding Meshal's placement on the watchlist apart from Meshal's own statements, which cut

against a finding of reasonable suspicion.  (See doc. 1, ¶ 29 (explaining Meshal was placed on the list due to his refusal to act as an FBI informant in Somalia in 2007, not due to any involvement with narcotics or explosives).)  At no point during the detention, nor in the briefing for this Motion, have Defendants specified what criminal activity they were investigating.  See Govan v. City of McIntyre, No. 5:16-cv-00503-TES, 2018 WL 3762997, at *8 (M.D. Ga. Aug. 8, 2018) (finding no arguable reasonable suspicion because, although the officer could point to reasons why the suspect was suspicious, he could "offer[] no details whatsoever as to exactly what specific crime or criminal activity would be implicated by these factors").  The Complaint plausibly alleges that the officers merely equated Meshal's presence on the list to ambiguous criminal activity, which they believed they were at liberty to investigate without regard for Meshal's constitutionally protected rights.  Accepting the Complaint's allegations as true, the officers did not have the requisite reasonable suspicion or even arguable reasonable suspicion to justify their actions, and accordingly are not entitled to qualified immunity on Count I at this stage.

## B.    Unlawful Search

Binding precedent also clearly establishes that officers cannot search a vehicle absent probable cause.  Maryland v. Dyson, 527 U.S. 465, 466 (1999).  "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found."  United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007) (internal quotation omitted).  Arguable probable cause still requires concrete and objective facts for the officer to have determined there existed a fair probability to find contraband.  See, e.g., Bradley v. Tucker, No. 4:14-cv-165, 2015 WL 64944, at *8 (S.D. Ga. Jan. 5, 2015) (finding that a drug-trained canine's alert to drugs provided the arguable probable cause for defendant officers to search a vehicle); Watkins v. Johnson, 853 Fed. App'x 455, 462–63 (11th Cir. 2021) (finding that a specific credible tip that identified a suspect and car

linked with an earlier assault, which matched the plaintiff and his vehicle, provided arguable probable cause for an officer to search the vehicle for the weapon used in the earlier assault).  The Complaint simply does not describe any objective facts that would support a fair probability that contraband would be found inside the vehicle.  The only facts in the Complaint that support Defendants' position are Meshal's inclusion on the watchlist and his trip to the site of the Super Bowl in Florida.  Yet the Complaint shows that Meshal accounted for the reasons for his travel, and Defendants received specific instructions not to extend the interaction due to Meshal's presence on the watchlist.  The Complaint reveals no adequate basis for a finding of arguable probable cause and, accordingly, Defendants are not entitled to qualified immunity on Count II.

## CONCLUSION

For the foregoing reasons, the Court finds that the Complaint plausibly alleges that Defendants' actions violated the Fourth Amendment's prohibition against unlawful searches and seizures by detaining Meshal and searching his vehicle without any reasonable suspicion or probable cause. The Complaint plausibly alleges Defendants' actions violated clearly established law, and thus, dismissal based on qualified immunity is not appropriate at this stage. Furthermore, the Complaint adequately alleges an ongoing violation of law and seeks prospective relief, and thus dismissal of Meshal's claims against Defendants in their official capacities are not barred by the Eleventh Amendment. Accordingly, Defendants' Motion to Dismiss is **DENIED IN PART**. However, the Court **GRANTS IN PART** the Motion solely as to Plaintiff's putative claims seeking the recovery of *damages* from Defendants Janufka and Oglesby in their official capacities and dismisses those claims.[7]

**SO ORDERED**, this 29th day of December, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[7] The Court reminds the parties of their obligation to submit a renewed Rule 26(f) report within fourteen (14) days of the date of this Order as directed in the Court's August 22, 2022 Order, (doc. 32).